# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00421-CR

**Leo Davis, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 426TH DISTRICT COURT OF BELL COUNTY
### NO. 83246, THE HONORABLE STEVEN J. DUSKIE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Leo Davis guilty of indecency with a child by sexual contact. *See* Tex. Penal Code § 21.11(a)(1). The trial court sentenced Davis to ten years' confinement. *See id.* § 12.33. In two issues on appeal, he contends that the evidence was insufficient to support the jury's guilty finding and that the trial court abused its discretion by admitting the testimony of Deborah Wycoff and Mary Salmond, both of whom he asserts "never examined or interviewed the complaining witnesses and were called by the prosecution to give irrelevant and improper expert testimony." We affirm the trial court's judgment of conviction.

# BACKGROUND

The indictment in this case alleged that Davis engaged in sexual contact by touching the genitals of Alice Mitchell,[1] an eight-year-old distantly related to his wife, Elsie Davis.

Alice, who was eleven at the time of trial, and her sister Katherine, who was thirteen, testified about being abused by Davis at a sleepover at his and Elsie's double-wide trailer on the night of September 27, 2020. Alice, Katherine, and their sister Stacie were related to Elsie—whom they referred to as "Aunt Lu"—through their father (Father).[2] During the sleepover, Davis, Elsie, and the three sisters watched a movie in the living room. Elsie sat in a recliner; Davis sat on the couch; and Alice and Katherine moved around, each sitting next to Davis at one point. Stacie fell asleep on the floor.[3]

Katherine, who first sat next to Davis on the couch, testified about his touching her and used diagrams of a nude girl and boy during her testimony. Indicating the girl's vagina and the boy's hand, she testified, "He touched it." After Davis touched her vagina, she got up but said nothing because she "didn't feel like talking about it." She had not discussed what happened with her sisters or with Morgan Bailey, their cousin.

After Katherine got up, Alice sat down next to Davis. He touched her vagina both above and below her underwear and moved his hand up and down. She was too scared to say anything. Eventually, she went into the kitchen and began to color. While she was standing at the

---

[1] We refer to all child-victims—Alice, Katherine Dupont, Stacie Driscoll, and Morgan Bailey—by pseudonyms in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

[2] Elsie testified that the children were her nieces. Mother testified that Father was Elsie's nephew. And Davis testified that Father was the nephew of Elsie's ex-husband.

[3] Stacie, who was fourteen at the time of trial, testified only that she had been asleep and did not know what happened to her sisters.

kitchen table, Davis sat in a chair next to her and "was touching her panties" and "going up and down with his hand." She was again scared but continued to color.

Elsie, who had gone to refill her drink, saw what Davis was doing and pushed him off of his chair. He fell down and hit his head on the wall, which frightened Alice, who began to cry. Elsie took Alice and Katherine into a bedroom and called 911. Elsie did not question the girls, but the police questioned Elsie after arresting Davis.

Harker Heights Police Department Officer Daniel Huff testified about his actions on responding to the trailer around 4 a.m. After arriving, he handcuffed and detained Davis in the back of a patrol car. Although he did not see any alcohol containers, Officer Huff could smell the odor of alcohol on Davis and noticed "a very faint smell" of alcohol on Elsie. Once he had secured Davis, Officer Huff questioned Elsie and advised her that he was unqualified to speak directly with the children. She, however, relayed each of his questions to the girls, and he wrote down their answers. He explained that Elsie "wasn't asking leading questions that would lead to a specific answer," and he had no "inclination" that the children had been coached in their responses. He acknowledged that detectives generally separate children during questioning and that he had failed to do so.

Bell County Sheriff's Office Investigator Donald Lohman testified about his role in the investigation. He arrived after Davis had been detained and questioned Elsie, Alice, and Katherine separately. Both of the girls "ma[de] outcries"[4] to him. He then Mirandized and questioned Davis, who was still seated in the patrol car's backseat. The questioning was recorded

_____

[4] An "outcry" refers to the first statement describing an alleged sexual offense made by the child-victim of the offense to a person, other than the defendant, who is eighteen years of age or older. *See* Tex. Code Crim. Proc. art. 38.072. Elsie was the State's outcry witness in this case.

3

by Officer Huff's body-camera, video from which was admitted into evidence. Davis stated that he did not know what was going on and that all he had done was tap Alice—whose name he could not remember—on the leg while she was coloring. He admitted that Alice and Katherine had sat next to him, but when asked if he had accidentally touched them on their "midsection[s]," he replied, "I don't think so." Told that one of the girls had alleged he touched her "privates," he responded, "That's not possible." He said that he did not know why the girls would make such accusations but that he and Elsie had been having marital problems.

During his investigation, Investigator Lohman learned that a month or two before the sleepover, Morgan, the girls' cousin, had reported being abused by Davis to the Killeen Police Department. It was later determined that the Bell County Sheriff's Office had jurisdiction of the case, and he attempted unsuccessfully to contact members of her family. Morgan's case was not resubmitted to the District Attorney's Office.

On cross-examination, Investigator Lohman testified that he watched a video of Alice's forensic interview. Although Alice had said in the interview that the "boy" who touched her was named "Uncle Luke"—who defense counsel asserted was Elsie's brother—Investigator Lohman testified that he did not contact or reach out to Uncle Luke.

Alice, Katherine, and Stacie's mother (Mother) testified about her family's relationship with Elsie and Davis. Katherine and Stacie "grew up" with Elsie and were excited about the sleepover; Alice, on the other hand, had first been to Elsie and Davis's trailer for Easter that year. Although her daughters loved Elsie, they did not often interact with Davis and would see him only on holidays. Morgan was Father's niece and the girls' cousin, and Mother was not aware of her allegation against Davis before the sleepover.

4

Mother testified that the morning after the sleepover, an officer came to her house. Mother called Elsie, who told her what had happened and brought the girls home. Mother and Father questioned them separately but did not ask suggestive questions, such as, "Did he touch you?" Katherine was upset, withdrawn, and would not make eye contact. Alice began crying and told Mother that "she was touched." Mother and Father took Alice and Katherine for sexual assault forensic examinations (SAFE) and forensic interviews. The children were not the same after the sleepover; they were no longer trusting and did not want to "stay over at people's houses."

Morgan, who was seventeen at the time of trial, testified about an incident that occurred when she was around ten in which Davis touched her vagina. At the time, she and her father were living with Davis and Elsie, whom she knew as her aunt. Morgan asked Davis, who was sitting on the living room couch, to fix a backyard swing set for her. Davis told her to give him a hug first, and when she did, he held her against his body, reclined his seat, and "put his hand in [her] pants and started touching" her. Touching skin, he rubbed his hand back and forth on her "private part," which she uses to urinate. She told him to stop because it hurt, but he did not. He pulled out his penis, which touched her shirt over her stomach, and only then was she able to push away from him and run into her father's room. Davis came to the door, told her to stop crying, and asked her not to tell anyone. She told her father and Elsie, but neither believed her. Her father threw a pack of cigarettes at her face and called her a liar. Elsie had her draw a picture of Davis's penis, which Elsie claimed was inaccurate. Morgan later told her aunt Nicole and her father's girlfriend about the abuse, but they likewise did nothing. It was only years later, after Morgan's grandmother saw a Facebook post made by Elsie, that Morgan's grandparents called the police. Morgan did not know Alice and had not discussed her allegation against Davis with Katherine or Stacie.

5

Elsie testified about the sleepover, her marriage to Davis, and Morgan's accusation. On September 27th, Elsie took Alice, Katherine, and Stacie to get toys and called Davis to let him know about the sleepover. Davis had "never really paid a whole lot of attention to the kids most of the time."

While the children, Davis, and Elsie were watching a movie in the living room, Alice got up from the couch where she had been sitting with Davis. The two had been covered by a blanket. Elsie noticed that Alice's pants were unbuttoned and asked her why. Alice only shrugged. Davis told her to fix her pants, which she did.

Alice went to color at the kitchen table. Elsie testified that "she went in there because I started getting nervous about [Davis's] behavior." The "biggest trigger" alerting Elsie that something was wrong occurred when Katherine lied down on the floor, and Davis reached toward her, saying, "[H]ey, come sit with me. Hey, come sit with me." Elsie was confused by his behavior because he never acted that way with the children.

Davis eventually followed Alice into the kitchen and colored with her, which was not something he would normally do. Elsie began paying close attention to them. She pretended to sit in her recliner but was "peeking around the corner" to "keep an eye" on Alice. "[O]ut of nowhere, []Davis put his hand on the inside of [Alice's] leg and started rubbing his hand up her leg . . . up the inside of her thigh." Elsie moved to confront him but realized that she had "jumped the gun" and "had nothing to do but maybe accuse him of something [of which she] had no idea." She continued to watch him from the chair. He turned to face Alice so that she was between his legs, put one hand on the child's back, and rubbed her vagina with the other.

Elsie panicked, ran into the kitchen, and rammed Davis out of his chair and into cabinets, yelling, "[Y]ou don't touch them!" She took Alice into a sunroom adjoining the kitchen

6

and asked if Davis had touched her. Alice told Elsie that he had put his hand inside her pants when they were sitting on the couch. Elsie called 911.

Davis asked them what was going on, and Elsie took Alice into the living room and had her sit on the couch. He followed them into the living room, leaned over Alice, and asked her "why did she tell that he had touched her." Elsie told him not to talk to or question Alice and took her into a bedroom. He again followed them and attempted to reach around Elsie toward Alice. Elsie told him to get away from them and, at the 911 operator's direction, took Alice and Katherine into the bathroom and leaned against the door. While in the bathroom, Elsie "learn[ed] something" from Katherine and related it to the operator. Officers responded to the trailer, and Elsie relayed the children's statements to them.

Davis and Elsie were married for around ten years and divorced in 2022; he filed for the divorce. She had been diagnosed with an STD, and at first he had accused her of cheating. However, at the time of the sleepover, Elsie thought their marriage was "fine." They continued to live together for a year or two after the sleepover because she had nowhere else to go, but their relationship during that time was "nonexistent."

Morgan, who Elsie described as "a daughter of a nephew from a previous marriage," accused Davis of sexual impropriety in 2014 or 2015, when she and her father were living with Davis and Elsie. Elsie "had no idea what to believe" and did not report Morgan's allegation to the police. She had picked up the phone to do so, but Morgan's father asked her not to. Elsie did not remember calling Morgan a liar or asking her to draw a picture of Davis's penis. Elsie had not told Mother about the accusation but assumed that it was "community knowledge that [Morgan] raised a flag."

7

On cross-examination, Elsie testified that she had drunk only one beer the night of the sleepover, that she did not have access to Davis's cell phone after his arrest, and that she did not transfer money from his bank or retirement accounts.

Salmond, the head of the SANE program at Baylor Scott & White McClane Children's Medical Center, testified about Alice's and Katherine's SAFEs, which were performed within thirty-six hours of the offense by Tanya Foster, a former SANE who had relocated out of state and whose reports were admitted without objection. Salmond testified that Foster had recorded the children's statements in "real time word for word." Both girls referred to the female sexual organ as the "pee pee spot" and the male sexual organ as the "wiener." Alice told Foster that "wherever he was touching me was wrong and now I don't feel okay." She added that "he is probably mad at me because I told my aunt what was going on and then I had to tell her." Asked who "he" was, Alice answered that "it starts with an L and L-O, something"; that she knew the man from her aunt's house; and that "he is probably my aunt's boyfriend or husband." Alice stated that the man had touched her on the couch and at the kitchen table and had touched her vagina both above and below her underwear. Because of Alice's discomfort with the exam, Foster limited her DNA swabbing to a single swab of Alice's vulva.

Katherine told Foster that "Aunt Lu's husband [] has been acting weird with me and [Alice]." Gesturing to her vagina, Katherine explained that Davis had "been touching us right here and stuff" and that "he rubbed up and down like six times but his hand stayed there the whole time." She told Foster that it "was gross and weird and it felt uncomfortable"; she was "never ever going by him again." Davis had only touched Katherine on the couch.

Patricia Rogers, a forensic scientist with the Department of Public Safety (DPS) Crime Lab in Waco, testified that she conducted biological-evidence screening of a cutting from

8

Alice's underwear and the swab of her vulva. Presumptive testing for the presence of semen was negative for both. Although Rogers did not perform the DNA testing in this case, she testified that the vulva swab and a swab of the underwear had both generated a single-source DNA profile consistent with the victim. Rogers explained that neither single-source nor mixture results are uncommon and that transfer DNA may not have been deposited because of washing or friction or because not enough material was transferred.

Sharon Cheatum, a sexual assault nurse examiner (SANE), testified about Morgan's SAFE on December 17, 2020, when Morgan was fourteen years old. Cheatum saw no injury on Morgan's vagina but testified that touching "would not damage" the vagina. Morgan's account of what had happened was similar to her trial testimony. She had asked Davis to raise the swing set, and he had asked for a hug in exchange. When she hugged him, he reclined his couch seat, held her "with force," and "started putting his hand in [her] pants and pushing his fingers inside of [her]." Pointing to a diagram of a vagina, she explained, "in the middle like the hole." Davis then "pulled out his wee wee," which touched "the lower part of [her] belly," but she was able to push him away and ran into her father's room. When she disclosed the abuse, Davis denied having touched her, and Elsie told her to draw a picture of "his pee pee." When Morgan did so, Elsie "said it didn't look like [his] pee pee and then said that [Morgan] was lying." Although that was the only time that Davis touched Morgan's vagina, he "always tried to grab [her] butt and boobs."

Cheatum explained why she had not attempted to gather DNA evidence. Morgan's SAFE occurred around four years after the abuse she described, and a SANE will not attempt to collect DNA after 120 hours because "DNA is no longer viable after that point."

Wycoff, a forensic interviewer, first testified about the Child Advocacy Center referral process and about forensic-interview procedure. Although she did not conduct Alice's,

9

Katherine's, or Morgan's interviews, Wycoff next testified about her observations and conclusions from having watched videos of their interviews. The interviewer followed "the accepted practice or procedure for doing a forensic interview." Both Alice and Katherine were talkative. Morgan was much shyer and more reserved. All three children were fairly calm; Wycoff did not recall "major crying." Each girl made an outcry, and Wycoff did not see any indications of coaching or dishonesty from them, though she was "not a hundred percent sure" that the interviewer asked the coaching questions. A small portion of Alice's interview video was admitted by the parties' agreement. Alice answered "Uncle Luke" when asked for "the name of the boy who did something wrong."

Davis testified during his case-in-chief about his account of the sleepover as well as why he believed the girls had accused him of sexual abuse. Alice and Katherine, who knew him as Uncle Leo, had taken turns sitting next to him. He had touched the girls because they were "bouncing around [him] all night" but did not "sexually touch them." Throughout the night, he drank six-to-eight beers, and Elsie drank a six-pack of beer. He was dozing and wanted to go to bed, but Elsie wanted him to stay up to put on another movie after the first one ended, which he testified she could not have done. When Alice went to color in the kitchen, he got up to move around and drew a puppy for her. She yelled at Katherine, so he "bopped her on the leg with the back of [his] hand to keep her focused on the picture." Elsie had been staring at him from the sunroom, and he supposed that it was the "bop" that caused her to run in and knock him off his chair, causing him to hit his head. He did not really remember what happened after that. He denied ever having touched a child for "sexual gratification."

Davis had learned of Elsie's STD in late August 2020. He thought she was unfaithful and was using the girls' allegations "as an excuse to cover herself for that, to save face

10

and get rid of [him]." It seemed to him that she had conspired with the children and "set all this up" to get his money. She was a "master manipulator" and had influenced the children, convinced them to lie, and planted memories in them. After his arrest, Elsie took his wallet, cell phone, and computer. She sold $50,000 of his stock holdings and removed $2,000 from their joint checking account and $6,000 from their joint savings account. He had to barricade his door when they lived together following his arrest because she repeatedly tried to break into his room while he was sleeping. Although Elsie's brother Luke had not been present for the sleepover, and Davis did not think he was involved, Davis did not know for sure.

On cross-examination, Davis agreed that he and Elsie had not had marital problems when Morgan made her allegation. Asked whether he had accidentally touched Alice's "female sexual organ," Davis answered, "As far as I remember, no, I did not." He agreed when asked whether that testimony was correct. However, when the State asked if he was saying that it was possible, but he did not remember, Davis testified that it was "not possible," that he had "mis-spoke," and that he "did not touch her in that manner."

The jury found Davis guilty of indecency with a child by sexual contact. After a punishment hearing, the trial court sentenced him to ten years' confinement. This appeal followed.

## DISCUSSION

### I.      Sufficiency of the Evidence

In his first issue, Davis contends that the evidence was legally and factually insufficient to support the jury's guilty finding.[5] Specifically, he argues that Elsie was not a

---

[5] The Court of Criminal Appeals has held that there is no meaningful distinction between the legal- and factual-sufficiency standards in the criminal context and that the *Jackson* standard is the only standard a reviewing court should apply in evaluating evidentiary sufficiency.

credible witness, that Alice's and Katherine's accounts were possibly tainted by investigators' leading questions and by Officer Huff's failure to separate them during questioning, that Morgan's accusation lacked probative value because of its remoteness, and that there was "absolutely zero DNA evidence" that he touched Alice. The State responds that the evidence was sufficient, that the jury was responsible for making credibility determinations, and that DNA evidence was not required.

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the hypothetically correct jury charge. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). We presume that

_____

*See Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Our concern is whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "'is restricted to guarding against the rare occurrence when a fact finder does not act rationally'" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see* Tex. Code Crim. Proc. art. 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487. When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *see Musacchio v. United States*, 577 U.S. 237, 243 (2016) (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The factfinder may rely on common sense and apply observation and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625.

13

As charged in this case, a person commits indecency with a child by sexual contact if he touches the genitals of a child younger than seventeen years of age with the intent to arouse or gratify the sexual desire of any person. *See* Tex. Penal Code § 21.11(a)(1), (c)(1); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.). "Touching a child through her clothing is encompassed by the offense." *Gonzalez*, 522 S.W.3d at 57; *see* Tex. Penal Code § 21.11(c)(1). "[I]t is well established that 'the requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances.'" *Corporon v. State*, 586 S.W.3d 550, 562 (Tex. App.—Austin 2019, no pet.) (quoting *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981)); *see Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental states are almost always inferred from acts and words."). "Intent can be inferred from conduct alone, and no oral expression of intent or visible evidence of sexual arousal is necessary." *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.). The uncorroborated testimony of a child-victim or outcry witness alone is sufficient to support a conviction for indecency with a child. *See Corporon*, 586 S.W.3d at 562; *Gonzalez*, 522 S.W.3d at 57.

The testimony of Alice, Katherine, and Elsie regarding the sleepover was detailed and largely consistent and agreed with statements made by the two girls during their SAFEs and forensic interviews. Alice and Katherine each testified that Davis rubbed her vagina in a manner that made her deeply uncomfortable. The touching was surreptitious. Elsie testified that Davis touched Alice beneath a blanket. And Alice told Foster that he "grabbed the blanket and hid with my sissy" and that he would stop touching Alice when Elsie looked over at him. Although Alice told the interviewer that "Uncle Luke" was the "boy who did something wrong," she identified Davis in open court as her abuser and stated during her SAFE—which was conducted the same

14

day that officers responded to the trailer—that the man who touched her was probably her aunt's boyfriend or husband and that his name "starts with an L and Lo something." Davis testified that the children knew him as Uncle Leo. The witnesses' credibility and the weight to be given to Alice's and Katherine's testimony and statements were matters for the jury to resolve. *See Zuniga*, 551 S.W.3d at 733; *Arroyo*, 559 S.W.3d at 487. It is not for this Court to act as a thirteenth juror and reweigh the evidence. *See Wilson v. State*, 863 S.W.2d 59, 65 (Tex. Crim. App. 1993).

Alice's and Katherine's allegations were similar to that of Morgan, who testified that Davis, while sitting on a couch, held her tightly and rubbed her vagina underneath her underwear. The jury could have reasonably inferred that Morgan's account did much to undermine Davis's defensive theory, as he testified that he and Elsie were not having marital problems at the time of Morgan's outcry. And far from suggesting that Elsie orchestrated the accusation, Morgan testified that Elsie did not believe her and accused her of lying. We assume that the jury resolved any contradictions or conflicts in the evidence in favor of its guilty verdict. *See Musacchio*, 577 U.S. at 243; *Zuniga*, 551 S.W.3d at 733.

The absence of DNA evidence was not dispositive of Davis's innocence. *See Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (recognizing that Texas does not require DNA evidence to support criminal conviction). Moreover, the jury was given an explanation for the absence at trial. Due to Alice's discomfort with the SAFE, only one swab was taken, so less evidence than usual was available for testing. Rogers testified that it was not uncommon to obtain a single-source profile and that transfer DNA may not have been left because of washing or friction. Alternatively, Davis simply may not have deposited enough DNA. The negative results from the presumptive tests for the presence of semen were explained by the fact that Alice alleged only that Davis had touched her vagina with his hand.

15

On this record and viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational juror could have found Davis guilty beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360. We overrule his first issue.

## II.    Admission of Wycoff's and Salmond's Testimony

In his second issue, Davis contends that the trial court abused its discretion by admitting Wycoff's and Salmond's testimony. Davis argues that both witnesses lacked personal knowledge, that their testimony was irrelevant, that they gave "improper expert testimony," that their "conclusions" were "drawn from inadmissible hearsay," and that testimony about "red flags" and coaching was inadmissible. The State responds that Davis failed to preserve error. Alternatively, the State argues that the trial court did not abuse its discretion and that any error was harmless.

To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). The objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

Salmond testified before Wycoff. Defense counsel did not object at any point during Salmond's testimony, including the admission of Alice's and Katherine's SAFE reports, which were prepared by Foster. Counsel objected only once during Wycoff's testimony:

16

DEFENSE COUNSEL:  Judge I object as personal knowledge.  I don't believe Ms. Wycoff was the actual interviewer.

THE COURT:  Response.

THE STATE:  She has reviewed it Judge.

THE COURT:  Any other response.

THE STATE:  No, sir.

THE COURT:  I will take this up at the bench, come on up.

After a brief bench conference, which was held off the record, the trial court excused the jury and allowed the parties to confer:

THE COURT:  We are still on the record, we are outside the presence of the jury.  Do you want to take up anything further or you want to talk off the record with [the State] first[?]  All right we will go off the record, I will let you guys talk.  Let me know if you need me to get involved.

. . . .

THE COURT:  Back on the record in case 83246.  I am about to bring the jury out.  Are there objections outstanding[?]

DEFENSE COUNSEL:  No, Judge, I believe everything has been cured.  I withdraw my objection.

THE COURT:  No rulings that are necessary at this time.

A withdrawn objection preserves nothing for appellate review.  *See Harrington v. State*, 547 S.W.2d 616, 620 (Tex. Crim. App. 1977) ("The objection having been withdrawn, nothing is presented for review."); *Rodriquez v. State*, 496 S.W.2d 46, 48 (Tex. Crim. App. 1973) ("[A]ppellant caused to be deleted the portions of the affidavit that he complained about and then stated that he had no objection.  Hence, he withdrew his original objection and preserved no error reviewable on appeal."); *see also Salazar v. State*, 38 S.W.3d 141, 148 n.3 (Tex. Crim. App. 2001)

17

("We . . . do not address that issue here, as any potential 606(b) objection was waived by both parties when they withdrew their initial objections."), *abrogated on other grounds as recognized by Nazar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021); *Rotondo v. State*, 860 S.W.2d 575, 578 (Tex. App.—El Paso 1993, no pet.) (concluding, where defense counsel withdrew his objection, that objection was waived). What is more, even if counsel had not withdrawn his objection, the issue would not have been preserved because counsel did not secure a ruling on his objection.[6] *See Ex parte Covarrubias*, 665 S.W.3d 605, 611–12 (Tex. Crim. App. 2023) ("It is axiomatic that an adverse ruling is necessary to preserve error.").

Accordingly, we conclude that Davis failed to preserve any error regarding the admission of Wycoff's or Salmond's testimony. *See* Tex. R. App. P. 33.1; *Pena*, 285 S.W.3d at 464. We overrule his second issue.

## CONCLUSION

Having overruled both of Davis's issues, we affirm the trial court's judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: January 15, 2026

Do Not Publish

_____

[6] It is obvious from the trial court's statement that no ruling was necessary that the court did not implicitly rule on the objection. *See* Tex. R. App. P. 33.1(a)(2)(A).